IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

|  |  |
|---|---|
| W.H., and Z.H., <br><br> Plaintiffs, <br><br> vs. <br><br> ALLEGIANCE BENEFIT PLAN MANAGEMENT INC., LOGAN HEALTH f/k/a KALISPELL REGIONAL HEALTHCARE, and the HEALTH BENEFIT PLAN for EMPLOYEES of KALISPELL REGIONAL HEALTHCARE, <br><br> Defendants. | CV 22–166–M–DWM <br><br><br> ORDER and OPINION |

Plaintiff Z.H. has a history of depression and, relevant to this litigation, received inpatient mental health treatment at various facilities.  Plaintiff W.H. is Z.H.'s father and a beneficiary of the Health Benefit Plan for Employees of Kalispell Regional Healthcare (the "Plan") who was denied benefits coverage for some of Z.H.'s treatments.  W.H. and Z.H. sued under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et. seq.*, to determine whether Defendant Allegiance Benefit Plan Management, Inc. ("Allegiance") was required to pay for her care.  The Plan, a self-funded employee welfare benefits plan, and Logan Health f/k/a Kalispell Regional Healthcare (the "Plan Administrator") are also Defendants.  The parties have filed cross motions for

1

summary judgment. (Docs. 21, 23.) For the reasons explained below, both motions are denied in part and granted in part.

## BACKGROUND

"Th[e] Plan is neither insurance nor an insured plan. It is a self-funded plan under which the hospital and its employees make contributions which are pooled to pay for medical claims." DEF000012. "Allegiance is also not an insurance company. It is a third[-]party administrator that provides claims payment services for self-funded employee health benefit plans." DEF000012. At all times relevant to this dispute, W.H. was a member and a participant in the Plan and Z.H. was a beneficiary of the Plan. (Doc. 17 at ¶¶ 6–7.) Logan Health was the designated administrator for the Plan, (*id.* at ¶ 4), and Allegiance was the Plan's third-party claims administrator, (*id.* at ¶ 5).

At issue in this case is benefits coverage for care Z.H. received at three inpatient mental health treatment facilities between November 2017 and September 2020: Solstice Residential Treatment Center ("Solstice"), Outback Therapeutic Expedition ("Outback"), and the Journey Home ("Journey Home"). In November 2017, Z.H. was a teenager receiving outpatient treatment to address her history of cutting, suicidal ideation, and attempted suicide. DEF000021.[1]

_____

[1] The administrative record is sealed. (*See* Docs. 20, 24.) It was filed conventionally with the Clerk of Court. (*See* Doc. 24.) Citations to the record are in the form provided on the record itself.

Z.H. was admitted to Solstice, an out of network facility, on November 20, 2017, and discharged on January 31, 2018. DEF000003. There, she was diagnosed with Major Depressive Disorder, Recurrent, Acute Stress Disorder, Unspecified Anxiety Disorder, and Moderate Alcohol Use Disorder. DEF000004. Although not conclusively diagnosed, Z.H.'s medical treatment providers considered post-traumatic stress disorder but did not ultimately diagnose her. DEF000004. In January 2018, Defendants denied coverage, reasoning that the care was not medically necessary. (*See* Doc. 17 at ¶¶ 16–20.) Plaintiffs thrice unsuccessfully appealed the denial. (*See id.* ¶¶ 22–41; *see also* Docs. 17-3, 17-4, 17-5, 17-6.)

Z.H. was admitted to Outback from March 15, 2019, to May 30, 2019. (Doc. 17 at ¶ 42.) Defendants denied Plaintiffs' claims for benefits for that period, again finding no medical necessity. (*Id.* ¶¶ 43–45.) Plaintiffs appealed twice more, and after soliciting an independent review, Defendants affirmed the denial of benefits. (*Id.* ¶¶ 46–49, 50–51; Doc. 17-7, 17-8.)

Z.H. was admitted to Journey Home from August 20, 2019, to September 22, 2020, and benefits coverage was again denied. (Doc. 17 at ¶¶ 55–58.) Plaintiffs appealed and Defendants partially overturned the initial decision, paying benefits from August 20, 2019, through November 10, 2019, after making a finding of medical necessity for that period. (*Id.* ¶¶ 59–61; Doc. 17-9.) Plaintiffs

3

again appealed on February 11, 2021, *see* DEF002220–27; the appeal was denied on March 19, 2021, DEF002211.

Plaintiffs now bring three causes of action: (1) a claim for recovery of benefits under 29 U.S.C. § 1132(a)(1)(B); (2) a claim for a violation of the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 (the "Parity Act") under 29 U.S.C. § 1132(a)(3)); and (3) a claim for statutory penalties under 29 U.S.C. § 1132(a)(1)(A) and (c). (Doc. 1.)

ANALYSIS

"Cross-motions for summary judgment in the ERISA context are merely a vehicle for deciding the case; the 'usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.'" *N.C. v. Premera Blue Cross*, 667 F. Supp. 3d 1102, 1106 (W.D. Wash. 2023) (quoting *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999)). Although Plaintiffs' claims arise out of the same set of events, each is considered separately. For the reasons discussed below, Defendants ultimately prevail on the first two claims, and Plaintiffs prevail on their third claim.

## I.      Denial of Benefits

After exhausting the administrative appeals process, ERISA allows a claimant to file a civil action in federal district court "to recover benefits" or "to enforce his rights under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

4

Benefits denial must comply with plan documents and ERISA's procedural safeguards. *Id.*; *see also Moyle v. Liberty Mut. Ret. Ben. Plan*, 823 F.3d 948, 956 (9th Cir. 2016). Administrative denials are "reviewed under a *de novo* standard unless the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits or to construe the terms of the plan," *Moyle*, 823 F.3d at 956, otherwise, they are reviewed for an abuse of discretion, *Firestone v. Bruch*, 489 U.S. 101, 115 (1989). Because this Plan unambiguously gives the Administrator, "full discretionary authority to interpret and apply all Plan provisions including, but not limited to, resolving all issues concerning eligibility and determination of benefits," DEF001808, the abuse of discretion standard applies here, (*see* Doc. 21-1 at 11; Doc. 23-2 at 2–3 (memorializing the parties' agreement)). Plaintiffs therefore bear the burden of showing that Defendants' denial decisions were "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011); *see Sluimer v. Verity, Inc.*, 606 F.3d 584, 590 (9th Cir. 2010). No abuse of discretion occurred if a denial was "based upon a reasonable interpretation of the plan's terms and if it was made in good faith." *Slumier*, 606 F.3d at 590 (internal quotation marks omitted). Ultimately, courts must "look to the plain language of the [plan]." *Moyle*, 823 F.3d at 957–58.

Plaintiffs argue Defendants erred by denying Z.H.'s benefits for inpatient

treatment when they (1) improperly relied on facts in this litigation that were not

cited below; (2) failed to provide them with a full and fair review during the

administrative appeals process; and (3) incorrectly concluded that Z.H.'s care was

not medically necessary.  Defendants disagree on all three points.  Because

Plaintiffs fail to demonstrate Defendants abused their discretion, Defendants are

entitled to summary judgment.

### A.     Record and Argument Not Before the Administrator

The "district court must examine only the rationales the plan administrator

relied on in denying benefits and cannot adopt new rationales that the claimant had

no opportunity to respond to during the administrative process." *Collier v. Lincoln

Life Assurance Co. of Boston*, 53 F.4th 1180, 1182 (9th Cir. 2022) (rejecting

credibility determinations made for the first time on judicial review); *see also

Spradley v. Owens*, 686 F.3d 1135, 1140 (10th Cir. 2020) (applying the same rule

under an abuse of discretion analysis).  Plaintiffs argue that Defendants have

improperly supplemented the record with post hoc rationalizations for their claim

denials. While Defendants concede that they cite facts raised for the first time in

this litigation, they insist these are not new rationales for denial.  Each party is

partially correct as outlined below.

6

### 1.    Solstice

Plaintiffs challenge four alleged post hoc arguments associated with Z.H.'s treatment at Solstice. Two of those challenges have merit. First, Plaintiffs seek to exclude Defendants' argument that a patient must be "suicidal, homicidal, or psychotic" to establish medical necessity for residential mental health treatment. Because Defendants' denials do not include such language, *see* DEF000364, Plaintiffs are correct and this rationale is not considered. However, as discussed below, this argument is not dispositive. Second, Plaintiffs seek to exclude Defendants' arguments about Z.H.'s lack of credibility in recounting her medical history. Just like in *Collier*, Defendants question Z.H.'s credibility for the first time in this litigation. *See* 53 F.4th at 1182. For example, as a part of her initial diagnosis at Solstice, Z.H.'s therapist noted that Z.H. represented she had attempted suicide four times in the previous three years. DEF000018. Defendants now dispute the veracity of that accounting because "the treatment provider did not independently verify the representation." (Doc. 27 at ¶ 28.) Defendants further argue Z.H.'s therapist at a different time "became suspicious" that Z.H. "may be exaggerating many stories," and that she may have threatened self-harm in furtherance of "attention seeking." (*See id.* (quoting DEF000413).) But the cited therapist report does not explicitly question whether Z.H.'s former suicide attempts occurred. *See* DEF000412–16. Nor does the record reflect that these credibility

challenges were raised during the prelitigation process; thus, they are not considered here.

Plaintiffs' other two post hoc challenges lack merit. First, Plaintiffs seek to exclude the fact that convenience was one reason Z.H. needed to receive inpatient treatment. But in each of their appeal letters, Plaintiffs stated that coordinating outpatient therapy "proves to be very difficult with all of the other outlying factors" in their life including work, school, and outpatient therapy. *See* DEF000010, DEF000168. And, in Allegiance's first appeal denial, it explicitly addressed this concern. *See* DEF00001. Moreover, one of the factors Defendants assessed in the medical necessity determination was whether the care was being administered for convenience sake. *See* DEF001822. Thus, Defendants' reliance on these facts is not an improper post hoc rationalization. Second, Plaintiffs argue Defendants' discussion of Dr. Todd Rutherford's medical opinion and accompanying notes should be excluded because they were not addressed in the administrative record. But in Defendants' final medical review, completed by the Advanced Medical Review Peer Review Network, the reviewer noted the addition of Dr. Rutherford's notes and records. *See* DEF000363.

### 2. Outback

Plaintiffs next argue that because Defendants failed to adequately explain their rationale for denying coverage for Z.H.'s care at Outback, they may not now

argue that a lower level of care was appropriate.  But Defendants' medical reviewers explained that "the patient did not have any severe depressive [sic] that required the intensity of acute inpatient level of care."  DEF012129–30.  The reviewer further noted that, based on "the clinical evidence, the patient could have been safely treated in a less restricted setting."  DEF012130.  Plaintiffs point out that before her admission to Outback, Z.H. had spent time in outpatient treatment and had attempted suicide during that time.  *See* DEF010112.  Plaintiffs also argue that "Defendants' denial letter again makes no attempt to explain why Z.H.'s symptoms and behavior did not constitute 'danger to self' or 'moderately severe' psychiatric symptoms causing serious 'disfunction in daily living.'"  (Doc. 23-2 at 9.)  To this point, Plaintiffs' argument has merit.  For example, in response to one of W.H.'s appeals, Defendants' medical review notes that "[f]or the dates in question, the patient was not reported to be suicidal, homicidal, or gravely impaired for self-care."  DEF012129.  This statement is not supported by the record.  But even if Plaintiffs are correct that Defendants were arbitrary and capricious in assessing Z.H.'s self-harm, Defendants still determined that a lower level of care was possible, an argument that Plaintiffs fail to address.

### 3.    Journey Home

Plaintiffs make two additional arguments for Z.H.'s Journey Home record.  They seek to limit the consideration of: (1) Defendants' characterization of Z.H.'s

9

social media use in their second-level review; and (2) an evaluation by Dr. George

Getty in the same review, *see* DEF003119–23. However, Plaintiffs make no

substantive case as to why these arguments and records should be excluded, but

merely list the communication and note that "Defendants did not communicate

these reasons for denying Z.H.'s claims." (Doc. 28 at 13–14.) They will not be

excluded on this undeveloped argument alone.

### B.     Adequate Notice and Full and Fair Review

Plaintiffs further argue that Defendants failed to follow ERISA's required

procedure by ignoring Plaintiffs' claims and refusing to provide specific,

referenced reasons for each denial. That argument lacks merit.

If a plan administrator denies a claim for benefits under a plan, ERISA

requires it "provide adequate notice in writing . . . setting forth the specific reasons

for such denial, written in a manner calculated to be understood by the

participants." 29 U.S.C. § 1133(1); *see also Abatie v. Alta Health & Life Ins. Co.*,

458 F.3d 955, 974 (9th Cir. 2006); 29 C.F.R. § 2560.503–1(g)(1). The plan must

also "afford a reasonable opportunity to any participant whose claim for benefits

has been denied for a full and fair review by the appropriate named fiduciary of the

decision denying the claim." 29 U.S.C. § 1133(1); *see also* 29 C.F.R. § 2560.503–

1(h). In other words, ERISA requires "a meaningful dialogue between ERISA

plan administrators and their beneficiaries. If benefits are denied in whole or in

10

part, the reason for the denial must be stated in reasonably clear language, with

specific reference to the plan provisions that form the basis for the denial." *Booton*

*v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997).

More specifically, when denying a claim, a plan administrator must provide:

"(i) [t]he specific reason or reasons for the adverse determination; (ii) [r]eference

to the specific plan provisions on which the determination is based; (iii) [a]

description of any additional material or information necessary for the claimant to

perfect the claim and an explanation of why such material or information is

necessary;" and, if the denial is based on medical necessity, "an explanation of the

scientific or clinical judgment for the determination, applying the terms of the plan

to the claimant's medical circumstances." 29 C.F.R. § 2560.503–1(g)(i)–(iii),

(v)(B). "While a health plan administrator may—indeed must—deny benefits that

are not covered by the plan, it must couch its rulings in terms that are responsive

and intelligible to the ordinary reader." *Booton*, 110 F.3d at 1465.

### 1.    Solstice

Plaintiffs argue that no meaningful dialogue occurred during the

administrative appeals process because Defendants failed to acknowledge evidence

submitted by Plaintiffs, failed to acknowledge the medical opinions of Z.H.'s

treating medical professionals, and failed to support their conclusions with

11

citations to medical records. While Defendants do not disagree as to the record, they convincingly argue they meaningfully responded to Plaintiffs' appeals.

Plaintiffs' main legal argument relies on the reasoning of a Tenth Circuit case, *D.K. v. United Behavioral Health*, 67 F.4th 1224 (10th Cir. 2023). In *D.K.*, like here, a minor beneficiary's parents challenged whether an ERISA plan administrator provided a full and fair review of their claim for benefits at a residential mental health treatment center. *Id.* at 1229. The plan administrator in *D.K.* made only passing reference to the claimant's condition and limited denial letters to boilerplate statements that "lacked any analysis, let alone reasoned analysis." *Id.* at 1242 (citation and quotation marks omitted). The Tenth Circuit upheld the district court's finding that the plan administrator acted arbitrarily and capriciously in part because "[i]t cannot be that the depth of an administrator's engagement with medical opinion would be revealed only when the record is presented for litigation." *Id.* at 1241–42. Here, however, Allegiance's denial letters contain more analysis than was provided in *D.K.*, including at least some substantive analysis of why benefits were denied. For example, Defendants' denial letters included medical reviewers' reports including explanations for why Z.H.'s treatment was not medically necessary. Thus, this argument fails.

Plaintiffs' main factual argument is that Defendants failed to perform a full and fair review because they ignored the medical opinion of Z.H.'s treating

12

psychiatrist, Dr. Rutherford.  When Plaintiffs appealed Defendants' denial for the

third time, they submitted Dr. Rutherford's medical opinion, including the basis for

his referral to residential treatment and his most recent treatment notes for Z.H.

*See* DEF000371–88.  Dr. Rutherford "recommended residential care for [Z.H.],

[because] she was truly struggling in multiple fronts in life" including illness of

loved ones, a "contentious relationship" with her family, rejection and isolation in

social settings, and multiple instances of being a victim of sexual assault.

DEF000372.  Notably, two weeks before her last meeting with Dr. Rutherford,

Z.H. reported being sexually assaulted by a male peer, leading to evaluation at a

hospital and a no-contact order placed on the alleged perpetrator of the assault.

DEF000385.  According to Dr. Rutherford, these factors led her to display

symptoms of "acute stress disorder" along with an "elevated level of depression

and anxiety" and suicidal thoughts and ideations.  DEF000372.  In addressing Dr.

Rutherford's report, Defendants' medical reviewer indicated they had considered

the letter in their review.  *See* DEF000363.  The reviewer was not required to

follow Dr. Rutherford's recommendations.  *See Black & Decker Disability Plan v.

Nord*, 538 U.S. 822, 831 (2003) (holding that when reviewing a claim for benefits,

an administrator is not required to "accord extra respect to treating physicians'

opinions").  This argument therefore also fails.

## 2.    Outback and Journey Home

Plaintiffs next contend that Defendants' Outback and Journey Home denials were arbitrary and capricious.  However, Plaintiffs' analysis is cursory.  They argue that while Defendants' denials cite to plan provisions, Defendants fail to acknowledge the evidence demonstrating that Z.H.'s treatment was medically necessary.  For Outback, Plaintiffs cite Defendants' second-level review denial that states the independent medical reviewer found the "inpatient level of care was not medically necessary." DEF010155.  For Journey Home, Plaintiffs cite to a different denial using the same language.  DEF001439.  Plaintiffs fail to explain why those two denials are insufficient.  They unpersuasively argue that the entire explanation for denial of benefits must be in the cover letters overviewing the plan administrator's decision.  There is no authority for this proposition and, even if there were, Defendants' denial letters contained detailed reasoning.

## C.    Medical Necessity[2]

Plaintiffs argue that even if Defendants fully and fairly reviewed the claims, benefits were improperly denied because Z.H.'s inpatient care at Solstice, Outback, and Journey Home was medically necessary.  Medical necessity determinations are strictly governed by Plan language.  *See, e.g.*, DEF000012.  The Plan allows

---

[2] The period covered in this dispute spans three Plan issuances, each containing identical provisions. *See* DEF001712, DEF001870, DEF002020.

reimbursement for "[s]ervices, treatments or supplies" that are, *inter alia*,

"Medically Necessary for the diagnosis and treatment of an Illness or Injury."

DEF001741.  The Plan defines "medically necessary" as any:

> [T]reatment, tests, services, or supplies provided by a Hospital, Physician, or other Licensed Health Care Professional . . . and which meet all of the following criteria:
>
> 1.  Are to treat or diagnose an Illness or Injury; and
> 2.  Are ordered by a Physician or Licensed Health Care Provider and consistent with the symptoms or diagnosis and treatment of the Illness or Injury; and
> 3.  Are not primarily for the convenience of the Covered Person, Physician or Licensed Health Care Provider; and
> 4.  Are the standard or level of services most appropriate for good medical practice that can be safely provided to the Covered Person and are in accordance with the Plan's Medical Policy; and
> 5.  Are not of an Experimental/Investigational or solely educational mature; and
> 6.  Are not provided primarily for medical or other research; and
> 7.  Do not involve excessive, unnecessary or repeated tests; and
> 8.  Are commonly and customarily recognized by the medical profession as appropriate in the treatment or diagnosis of the diagnosed condition; and
> 9.  Are approved procedures or meet required guidelines or protocols of the Food and Drug Administration (FDA) or Centers for Medicare/Medicaid Services (CMS), pursuant to that entity's program oversight authority based upon the medical treatment circumstances.

DEF001822–23.  To determine appropriateness in residential treatment scenarios,

Defendants use the Milliman Care Guideline for "Residential Acute Behavioral

Health Level of Care."[3]  *See* DEF038704–22.  Under this Guideline, the following three criteria must be met: (1) the patient must be a danger to one's self or others or have a moderately severe psychiatric or behavioral condition that causes "[s]erious dysfunction in daily living"; (2) the level of care must be judged to improve the patient's condition; and (3) the patient must meet a series of necessary benchmarks including, *inter alia*, that "[r]ecommended treatment is . . . not feasible at a lower level of care," the patient is "willing to participate," and there is "no anticipated need for physical restraint."  DEF038704.  Ultimately, because Defendants acted within their discretion in applying the Plan's plain language, they did not act arbitrarily and capriciously in determining that Z.H.'s care was not medically necessary.

### 1.    Solstice

In their first-level review denial letter for Z.H.'s care at Solstice, Defendants explained that "treatment at the mental health outpatient level of care with a focus on dialectical behavioral therapy should have been considered as an alternative." DEF000048.  In response to Plaintiffs' second-level appeal, Defendants relied on

---

[3] "To determine whether a person needs inpatient or outpatient care, most hospitals use one of two systems: the InterQual Criteria or the Milliman Care Guidelines. . . . [T]he Milliman Guidelines were written and reviewed by over 100 doctors and reference 15,000 medical sources." *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 690 (6th Cir. 2017).  As of 2017, Milliman Care Guidelines were used by over 1,000 hospitals nationwide. *Id.*

Dr. Eric Chavez's review. *See* DEF000001–7. Dr. Chavez explained that there "is no evidence of current acute and severe psychiatric condition that required [a] 24[-]hour medical and nursing supervisor." DEF000006. He further explained Z.H. did not suffer from any "acute/active suicidal ideation/intent/plan" and that she "did not have any medical problems that required treatment in a hospital." DEF000006. The third-level review denial letter also explained that, "[b]ased on the documentation provided[,] there is no reason why the patient could not have undergone treatment in a partial hospitalization program (PHP) or an intensive outpatient program." DEF000364.

Plaintiffs argue that these determinations were incorrect and that the record conclusively establishes it was medically necessary for Z.H. to receive inpatient care at Solstice. Plaintiffs' chief concern is that Defendants ignored that Z.H. was a "danger to self." This, Plaintiffs contend, "independently justifies admission into residential treatment under the [Milliman Care Guidelines]." (Doc. 23-3 at 8.) Plaintiffs emphasize that Z.H. was having nightmares caused by her sexual assault, that she had been drinking heavily, that she had attempted suicide multiple times within the past year, that she was becoming increasingly withdrawn and combative, and that she had been engaging in self-harm. DEF000009–10, DEF000014–16, DEF000018. W.H. sent Z.H. to inpatient treatment at Solstice in part because "in the days leading up the decision to admit her, [Z.H.] had cut

17

multiple times up and down each forearm." DEF000368. Z.H.'s parents had

initially planned to admit her to the local residential treatment center, but once

Z.H. found out about this plan, she "fled on foot." DEF000368.

Plaintiffs are correct that the record shows Z.H. had engaged in and

threatened self-harm in the days and weeks leading up to her admission to Solstice.

*See* DEF000372. However, this fact is not dispositive. While Defendants' medical

reviewers rejected the idea that Z.H. was indeed suicidal or in danger of harming

herself, *see* DEF000004 ("[t]he patient had last suicidal ideation in early 2017"

though she was admitted to Solstice in November 2017), a conclusion to the

contrary would satisfy only the first prong of three necessary criteria under the

Milliman Care Guideline, *see* DEF038704. The third prong requires *all* the

following seven sub-criteria be met:

> (1) Recommended treatment is necessary, appropriate, and not feasible at lower level of care . . . .
> (2) Very short-term crisis intervention and resource planning for further care at nonresidential level is unavailable or inappropriate.
> (3) Patient is willing and able to participate . . . in treatment within highly structured setting voluntarily.
> (4) There is no anticipated need for physical restraint . . . .
> (5) There is no need for around-the-clock medical or nursing care.
> (6) Patient has sufficient ability to respond as planned to individual and group therapeutic interventions.
> (7) Biopsychosocial stressors have been assessed and are absent or manageable at proposed level of care . . . .

DEF038704. Medical reviewers repeatedly determined that an outpatient level of

care was a reasonable alternative. *See* DEF000006, DEF000364; *see Black &*

18

*Decker Disability Plan*, 538 U.S. at 831 (explaining that medical reviewers can disagree with treating physicians).  Thus, even if Defendants' self-harm analysis was arbitrary and capricious, Defendants did not abuse their discretion in determining that Z.H.'s Solstice stay was not medically necessary.

###### 2. Outback

Plaintiffs' Outback argument likewise fails.  Again, Plaintiffs argue that Defendants' denials ignore Z.H.'s symptoms and behavior that constituted a "danger to self" or "moderately severe" psychiatric symptoms causing serious "dysfunction in daily living."  But again, the denial letters were not contingent upon that factor, but rather the fact that a lower level of care was a safe option.  For example, medical reviewer Dr. Ashraf Ali concluded that Z.H.'s care at Outback was not medically necessary because she "was not reported to be suicidal, homicidal, or gravely impaired for self-care.  There was no report of self-harm. She was not aggressive. . . . *The patient did not have any severe depressive that required the intensity of acute inpatient level of care.*   From the clinical evidence, *the patient could have been safely treated in a less restricted setting.*" DEF012129–30 (emphasis added).  Defendants' medical reviewers made a medical necessity determination based on the Plan's language.  There is no indication that Defendants abused their discretion in reaching this conclusion.

19

### 3.   Journey Home

For Journey Home, Plaintiffs argue that Defendants abused their discretion in making a medical necessity determination because Defendants' denial letters did not provide any rationale for their decision.  Not so.  The medical reviewers of Z.H.'s inpatient treatment at Journey Home found that after being admitted in August 2019, by November 10, 2019, Z.H. was "doing very well, and could clearly be transitioned to a lower level of care in [outpatient] therapy, group and individualized."  DEF018443.  The medical review attached to the rejection letter explained that Z.H. "was enrolled in a program that resulted in stepdown to a partial hospitalization program on 08/20.  A brief stay [at Journey Home] in order to transition to [outpatient] treatment is appropriate and medically necessary."  DEF 018443.  But "after November 10, 2019[,] the member is doing very well and could clearly be transitioned to a lower level."  DEF018443.  Thus, Plaintiffs have failed to demonstrate that Defendants' medical necessity determination regarding Journey Home was arbitrary and capricious.

## II.   Parity Act

ERISA provides equitable relief for a violation of any of its provisions.  29 U.S.C. § 1132(a)(3); *see Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996).  This includes violations of the Parity Act, which prohibits, *inter alia*, processes, strategies, evidentiary standards, or other "gatekeeping" methods that make it

20

harder to access mental health treatment than it is to access equivalent medical/surgical treatment.  29 U.S.C. § 1185a(3)(A); *see also Ryan S. v. UnitedHealth Grp., Inc.*, 98 F.4th 965, 971 (9th Cir. 2024).  Equal treatment is required in developing nonquantitative necessity criteria for both medial and behavioral coverage.  29 C.F.R. § 2590.712(c)(4)(i), (ii)(A).  To prove a Parity Act violation, the plaintiff must show that an ERISA plan provides both: (1) medical and surgical benefits and mental health or substance use disorder benefits and (2) imposes "more restrictive limitation on [mental health/substance abuse disorder] treatment than limitations on treatment for medical and surgical issues." *Ryan S.*, 98 F.4th at 971 (internal quotation marks omitted).  However, the treatment criteria need not be the same, *id.*, because "symptoms resulting from a behavioral disorder will vary from that of a medical disorder, as will the appropriate treatments," *K.K. v. Premera Blue Cross*, 2023 WL 3948236, at *5 (W.D. Wash. June 12, 2023).  Plan compliance with the Parity Act is reviewed de novo.  *See Long v. Flying Tiger Line, Inc. Fixed Pension Plan for Pilots*, 994 F.2d 692, 694 (9th Cir. 1993); *see also K.K.*, 2023 WL 3948236, at *1.

The parties do not dispute element (1).  Thus, the question is whether medical necessity classifications for those services are disparate.  Plaintiffs argue that Defendants varied upward for substance abuse disorder treatment by requiring more than the Milliman Care Guidelines require for a determination of medical

necessity. They further argue that this upward variance is not reflected in the medical necessity determination for skilled nursing care. In response, Defendants argue that because the Plan does not specify different processes for developing mental health versus medical/surgical policies, the Parity Act is satisfied. Defendants are correct.[4]

As discussed above, Defendants use the Milliman Care Guidelines to determine medical necessity criteria for "Residential Behavioral Health Level of Care." (*See* Doc. 17 at ¶¶ 19, 20, 33.) Defendants note they also use the Milliman Care Guidelines for medical necessity criteria for medical/surgical care, including for example the "Medical Admission Recovery Facility" guideline. (*See* Doc. 21-1 at 29.) The Milliman Care Guidelines are updated annually for both mental health and medical/surgical care using the same processes. *See* DEF038944–038945. The Parity Act merely prohibits plan administrators from "employ[ing] different processes, strategies, or evidentiary standards" to their medical necessity determinations. *See K.K.*, 2023 WL 3948236, at *5. It does not prohibit different outcomes. *See id.* Plaintiffs have the burden of showing the Parity Act was violated, *see Stone v. United Healthcare Ins. Co.*, 979 F.3d 770, 774 (9th Cir. 2020), and they fail to do so here.

---

[4] As a threshold issue, Defendants argue that if Plaintiffs' benefits claim fails, their Parity Act claim cannot proceed independently. This is incorrect. *See Danny P.*, 891 F.3d at 1158–59 (reviewing a standalone Parity Act claim).

### III.   Parity Act Disclosure

#### A.   Disclosure Requirements

Plaintiffs argue that Defendants violated the Parity Act's statutory disclosure requirements by failing to disclose certain documents during the administrative appeal process.  They claim that Defendants never properly responded to W.H.'s November 8, 2021, letter requesting certain plan instruments from the Plan Administrator, triggering penalties.  Plaintiffs are correct; Defendants withheld documents Plaintiffs were entitled to receive.

ERISA plan administrators must, upon request, provide participants with "the latest updated summary, plan description, and the latest annual report, any terminal report, [and] the bargaining agreement, trust agreement, contract, or *other instruments* under which the plan is established or operated."  *See* 29 U.S.C. § 1024(b)(4) (emphasis added).  Parity Act regulations promulgated in 2013 and effective January 2014 define "*[i]nstruments* under which the plan is established or operated," as:

> documents with information on medical necessity criteria for both medical/surgical benefits and mental health and substance use disorder benefits, as well as the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits.

29 C.F.R. § 2590.712(d)(3) (emphasis added).

23

Defendants rely on the Ninth Circuit authority, *Shaver v. Operating Engineers Local 428 Pension Trust Fund*, 332 F.3d 1198 (9th Cir. 2003), that predates the Parity Act Regulations. The *Shaver* Court held that "instruments under which the plan is established or operated" refer to "documents that provide individual participants with information about the plan and benefits," which includes "only legal documents that describe the terms of the plan, its financial status, and other documents that restrict or govern the plan's operation." *Id.* at 1202–03.

Ten years later, the Department of Labor promulgated new Parity Act Regulations. Since then, courts appear to disagree whether to apply *Shaver*'s narrow definition of "instruments" or the Parity Act Regulations' definition. *Compare Zavislak v. Netflix, Inc.*, 2024 WL 382448, at *23 (N.D. Cal. Jan. 31, 2024) (relying on *Shaver*), *with M.S. v. Premera Blue Cross*, 553 F. Supp. 3d 1000, 1034-35 (D. Utah 2021) (relying on 2013 regulations). While the Ninth Circuit has yet to address this issue, the Tenth Circuit and its district courts apply the Parity Act Regulations' definition of instruments. The Tenth Circuit has held that 29 C.F.R. § 2590.712(d)(3)'s definition of "instruments" clarifies the term as it is used in 29 U.S.C. § 1024(b)(4). *E.W. v. Health Net Life Ins. Co.*, 86 F.4th 1265, 1291 (10th Cir. 2023). Likewise, the United States District Court for the District of Utah has explicitly addressed this tension, explaining:

[b]efore the Department of Labor issued this Parity Act regulation, . . . the scope of documents subject to 29 U.S.C. § 1024(b)(4)'s "instruments under which the plan is operated language" was the subject of a circuit split. The majority of circuits adopted a narrow interpretation, concluding "instruments under which the plan is operated" was comprised of only formal legal documents.

*M. S. v. Premera Blue Cross*, 553 F. Supp. 1000, 1034–35 (D. Utah 2021) (cleaned up). It concluded, however, that after the Parity Act Regulations, "evaluation criteria used to determine medical necessity for analogous medical/surgical benefits is within the scope of 29 U.S.C. § 1024(b)(4) and must be provide to plan participants upon written request." *Id.* at 1035. This conclusion is persuasive. Because the Parity Act Regulations specifically interpret 29 U.S.C. § 1024(b)(4), they are applied here.

Plaintiffs argue that Defendants' lack of response to two of their requests violate these Parity Act disclosure requirements. First, on November 8, 2021, Plaintiffs requested "[a] complete copy of the medical necessity criteria utilized by the Plan for skilled nursing facilities, sub-acute inpatient rehabilitation treatment, and inpatient hospice treatment." DEF001017. Comparing this request against the statute and the Parity Act Regulations, Defendants were required to provide Plaintiffs with the requested documents. *See* 29 C.F.R. § 2590.712(d)(3) (requiring disclosure of "documents with information on medical necessity criteria for both medical/surgical benefits and mental health"). Second, in the same document, Plaintiffs requested "[c]opies of documents identifying the processes,

strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan." DEF001017. Comparing this request against the statute and the Parity Act Regulations, Defendants were required to furnish these documents as well. *See* 29 C.F.R. § 2590.712(d)(3) (requiring disclosure of "documents with information on . . . the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits"). Because it is undisputed that these requests for disclosure were not fulfilled, Defendants violated the Parity Act's disclosure requirements. (*See* Doc. 17 ¶¶ 66–68 ("Defendants maintain that they sent Plaintiffs all of the documents they were legally entitled to."); *see also* Doc. 26 at 20–21.)

### B.  Statutory Penalties

Having concluded Defendants violated their obligations under the relevant Parity Act disclosure provision, it is necessary to fashion a reasonable penalty. Under 29 U.S.C. § 1132(c)(1)(B), "[a]ny administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter[5] to furnish to a participant or beneficiary . . . within 30 days after

---

[5] The subchapter referenced is Subchapter I, Protection of Employee Benefit Rights—§1001 through § 1193c, inclusive of § 1132—under Title 29, Chapter 18 of the United States Code.

such request may in the court's discretion" be liable for a penalty of up to $100.[6]
*See also Bafford v. Admin. Comm. of Northrop Grumman Pension Plan*, 2024 U.S.
App. LEXIS 11315, *32–33 (9th Cir. May 9, 2024).  The statute "does not require
a plan administrator to act in bad faith to be liable for a penalty."  *Id.* at *33.

Defendants failed to satisfy their disclosure obligations and in doing so
interfered with Plaintiffs' ability to understand and protect their rights under the
Parity Act and ERISA.  Although Defendants argue that any disclosure error was
harmless, as Plaintiffs correctly point out, the intent of the statute is to furnish plan
members with information needed to determine whether the administrator has
complied with the law.  By failing to furnish materials to which Plaintiffs were
entitled, Defendants harmed Plaintiffs' ability to adequately access financial
benefits to which they believed they were also entitled.  The fact that there is no
Parity Act violation as alleged in Plaintiffs' second cause of action does not
insulate Defendants from their statutory requirement to comply with the law.
Simply put, Defendants refused to comply with Plaintiffs request for the disclosure
of documents that Congress, and the Department of Labor, explicitly require to be
disclosed.  It does not matter whether Defendants' refusal was based on a good
faith misreading of the law or a bad faith intention; statutory penalties are
appropriate.

---

[6] The maximum daily penalty is now $110.  *See* 29 C.F.R. § 2575.502c-1.

For this, Defendants must pay a penalty of $110 per day from November 8, 2021—30 days after the date of the Plaintiffs' written request—through the date this suit was filed—September 28, 2022, for a total of 294 days, totaling $32,340.00.  Plaintiffs also request prejudgment interest and attorney's fees and costs.  Although these remedies may be appropriate under 29 U.S.C. §§ 1132(a)(3)(B) and 1132(g), this issue has not been sufficiently briefed and no decision on the matter will be made at this time.  *See Benesowitz v. Metropolitan Life Ins. Co.*, 514 F.3d 174, 176 (2d Cir. 2007) (holding the award of prejudgment interest in the ERISA context is discretionary).

C<small>ONCLUSION</small>

Based on the foregoing,

1.     IT IS ORDERED that Defendants' motion for summary judgment (Doc. 21) is GRANTED in part as to Claims I and II and DENIED in part as to Claim III; Plaintiffs' motion for summary judgment (Doc. 23) is GRANTED in part as to Claim III and DENIED in part as to Claims I and II.

2.     IT IS FURTHER ORDERED that Defendants must pay Plaintiffs statutory penalties in the amount of $32,340.00.

3.     IT IS FURTHER ORDERED that Plaintiffs may move for prejudgment interest and attorneys' fees and costs by July 15, 2024.  Defendants

may respond in accordance with District of Montana Local Rule 7.1(d).  Judgment will be entered after all issues in the case have been resolved.

DATED this ____ day of June, 2024.

_____
Donald W. Molloy, District Judge
United States District Court